# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO: 3:20-cr-69 |
| | ) | |
| vs. | ) | **REPORT AND RECOMMNEDATION** |
| | ) | **ON DEFENDANT'S MOTION TO** |
| DEVON ALLEN MCCONNELL, | ) | **SUPPRESS** |
| | ) | |
| Defendant. | ) | |

## TABLE OF CONTENTS

I.    INTRODUCTION…………………………………………………………………....…..2

II.    FINDINGS OF FACT………………….….…………………………….….…………3

    A.  TESTIMONY OF DETECTIVE DANIEL BEAUDRY….…………….….……….3

    B.  TESTIMONY OF PATROL OFFICER SAMUEL MILLER…………….………….6

    C.  TESTIMONY OF PATROL OFFICER CHAD HUETMANN…………………….7

    D.  TESTIMONY OF DETECTIVE ARIC ROBINSON………………...………….9

III.    ANALYSIS OF MOTION TO SUPPRESS...…………………………………....11

    A.  THE VEHICLE STOP AND DETENTION OF DEFENDANT…..……………….....11

    B.  FIRST SEARCH OF VEHICLE …………………….…. ………….….………….14

    C.  DEFENDANT'S STATEMENT – ILLEGAL STOP AND SEIZURE...…………....16

    D.  DEFENDANT'S STATEMENTS – *MIRANDA* ………..……….………………...17

        1.  Deliberate attempt to circumvent *Miranda*………………………………….…17

        2.  Voluntariness…………………………………………………………….…..20

    E.  SEARCH WARRANT – PROBABLE CAUSE …………………...……….……….23

IV.    RECOMMENDATION AND ORDER………………………………………….…......27

# I.  INTRODUCTION

This matter comes before the Court pursuant to Defendant's Motion to Suppress Evidence and Statement and Request for Evidentiary Hearing (Dkt. 35) and Brief in Support (Dkt. 35-1), both filed March 29, 2021 by Devon Allen McConnell ("Defendant"). Defendant seeks to prohibit the government from using as evidence the physical items found and seized during the search, the testimony of the officers concerning their observation of the physical items allegedly found during the search and detention, and any testimony concerning alleged statements or admissions by Defendant. Dkt. 35. The government resisted the motion on April 19, 2021. Dkt. 39. The matter was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for report and recommendation by Chief Judge John A. Jarvey. Dkt. 40.  Trial is set for July 6, 2021. Dkt. 45.

An evidentiary hearing was held on May 14, 2021. Dkt. 50. The government appeared by Assistant U.S. Attorney Caleb J. Copley. Defendant appeared personally and with his attorney, Terence L. McAtee. Testimony was received from Detective Daniel Beaudry of the Moline, Illinois Police Department, Patrol Officer Samuel Miller of the Davenport Police Department, Patrol Officer Chad Huetmann of the Davenport Police Department, and Detective Aric Robinson of the Davenport Police Department. The Court received two exhibits offered by Defendant without objection: Exhibit A – a map of the area involved in this case and Exhibit B – a copy of the search warrant involved in this case. The parties were allowed to file post-hearing briefs. Dkt. 50. Defendant filed his supplemental brief on May 21, 2021. Dkt. 51. The government filed its response to Defendant's supplemental brief on May 24, 2021. Dkt. 52.

The Court considers the matter to be fully submitted. This Magistrate Judge has carefully considered the record evidence, including the exhibits admitted, the briefs filed by both parties, the arguments and statements of counsel and submits the following report. As set forth below,

based on the facts presented and applicable law, it is recommended that the motion be granted in part and denied in part.

## II.     FINDINGS OF FACT

A three count criminal indictment was filed on July 7, 2020 against Defendant alleging possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), and felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Dkt. 2. The charges against Defendant arose on February 14, 2020 from a Moline, Illinois Police Department investigation into Defendant regarding drugs and firearms.

### A.     Testimony of Detective Daniel Beaudry

Detective Daniel Beaudry has been a police officer with the Moline Police Department for seven years. He has been with the criminal investigation division for three years. From December 2019 into February 2020, he conducted a drugs and firearm investigation involving Defendant. Leading up to February 14, 2020, Detective Beaudry knew from a confidential source Defendant was selling methamphetamine and in possession of a firearm. The confidential source was attempting to work off charges by giving information, had given information on a frequent basis and was considered reliable and trustworthy. This information was considered "fresh" as of February 14, 2020. From a review of Defendant's criminal history, Detective Beaudry was aware Defendant had a felony robbery conviction in 2012 in Rock Island County, Illinois, described Defendant's criminal history as extensive and violent, knew Defendant as someone who carried firearms although he did not have firearms convictions and knew Defendant's Illinois driver's license was revoked.

On February 14, 2020 at approximately 9:00 a.m., Detective Beaudry and other officers were conducting surveillance of a location in the 2800 block of 9th Avenue in Moline, Illinois, where it was believed Defendant was living.[1] He observed Defendant exit the residence through the north door and drive away in a white Chevy Malibu with Iowa plates. The car was not in Defendant's name and no one else was observed in the car at that time. Detective Beaudry and the other officers followed the white Chevy Malibu, planning to conduct a vehicle takedown if an opportune time arose. Although a traffic stop could have been performed due to Defendant's revoked driver's license, the officers decided against this as they strongly believed Defendant would flee. In addition, each officer was in a separate unmarked squad car. According to Detective Beaudry, a marked squad car is needed if the officers were going to stop the car for a traffic stop.

The officers followed Defendant as he proceeded into Rock Island and then across the Centennial Bridge into Davenport, Iowa. At this point, a Moline officer contacted the Davenport Police Department to notify them of the situation and request assistance.[2] As he entered Davenport, Defendant pulled into a gas station on West River Drive. Upon arrival there, Defendant pulled next to the gas pumps and a second person entered the car. Shortly thereafter Davenport police units arrived, a vehicle takedown was performed, and a felony stop was conducted, taking Defendant into custody.

Detective Beaudry explained a vehicle takedown occurs when a vehicle is blocked from the front and rear by law enforcement squad cars. This maneuver is performed due to the nature of an investigation and is typically used with a person who is believed to be in possession of a firearm

---

[1] Detective Beaudry had information Defendant may be associated with 504 Smith Street, Grand Mound as well.

[2] Detective Beaudry testified he has jurisdiction to arrest someone in Davenport and into Iowa. However, due to Moline Police Department policy, whenever Moline Police Department officers enter another agency's jurisdiction, assistance is requested.

or is known to be a drug user and drug dealer. If it is suspected the person might flee, the block can prevent this. When making a felony stop, the occupants in a vehicle are ordered out at gun point and by verbal commands to take the occupants into custody safely.

Detective Beaudry positioned his squad car in front of Defendant's car, but he did not see Defendant removed from it.[3] Defendant was detained by Davenport Police Officer Chad Huetmann. Detective Beaudry testified he saw in plain view a baggie in the front seat or near the center console of Defendant's car. Based on his training and experience, the baggie appeared to contain methamphetamine. The doors on the car were closed at the time he observed this. Detective Beaudry progressed from the gas station directly to the Davenport Police Department.

Detective Beaudry estimated within one hour of the felony takedown he conducted an in-custody interview of Defendant at the Davenport Police Department. Detective Beaudry was not involved in detaining or transporting Defendant to the police department, does not know Officer Huetmann and had no knowledge of Officer Huetmann's interaction with Defendant. Prior to beginning the interview, Detective Beaudry read Defendant his *Miranda* rights from a Moline Police Department form. Defendant did not indicate he had any questions regarding his rights or that he did not understand his rights. Detective Beaudry told Defendant the *Miranda* rights form was just an acknowledgment he understood his rights, nothing else.

After signing and initialing the *Miranda* form, Defendant indicated he was willing to talk and the interview proceeded. Defendant admitted he was coming from Moline, Illinois and picked up a passenger at the gas station because the person owed him money. Further, he planned to sell methamphetamine to another person that morning at Chuck E. Cheese. Defendant admitted having a loaded firearm in his possession inside the car, specifically a black and silver Taurus nine-

---

[3] Detective Beaudry's squad car hit another car not involved in this investigation.

millimeter. He described how he acquired this gun, and explained he carried the gun occasionally for his safety. Defendant did not make any statements about hiding the gun during or right before the stop. Detective Beaudry testified Defendant was articulate and at no time did he believe Defendant had any mental issue or did not understand what was going on in the interview.

### B.    Testimony of Patrol Officer Samuel Miller

Patrol Officer Samuel Miller of the Davenport Police Department has been a police officer for almost seventeen years. Although he is primarily a patrol officer, he is also a drug recognition expert, a lie detector instructor, and a crash investigator. On February 14, 2020, he was in a marked squad car and in a "Class C" uniform identifying him as a police officer. At approximately 10:18 a.m., he was called to assist with a traffic stop concerning Defendant. He was aware the Moline Police Department had information Defendant had a handgun in a car.

He proceeded to the gas station on West River Drive in Davenport, Iowa across from the skate park. As he pulled into the station, he positioned his squad car facing north, behind Defendant's car which was stopped at gas pump number two. At no time did he see the car in operation. Officer Miller saw a Moline Police Department squad car arrive, slide on the ice, and hit a truck. Another Davenport Police Department marked squad car pulled up to the driver side front door. At this time, Defendant backed his car into Officer Miller's squad car attempting to get away. Officer Miller held his position by putting pressure on his gas pedal. Ultimately, Defendant could not move. Officers were yelling at Defendant to put his hands out of the window, and he did so first, with the passenger following suit.

Officer Miller initially dealt with the passenger in the car, Dylan Vasold. He testified his police report states Vasold walked to him first. However, Officer Miller indicated this is an error because Defendant was actually walked back to him first. Officer Miller put Defendant in

handcuffs and turned him over to Officer Huetmann and his partner. He stated he had no interactions with Defendant other than securing him in handcuffs.

He next secured Vasold in his squad car. As he did this, Officer Miller reported Vasold was very nervous and anxious to leave. Officer Miller's report indicated Vasold stated he had to go pay bills and he thought the stop had something to do with Defendant having a gun inside the car. Defense counsel played two sections of Officer Miller's body camera video to refresh his recollection as to this exchange.[4] The first video played at the hearing shows Vasold talking about a video game controller being tossed in Defendant's car. Officer Miller testified firmly the portion of his body camera video just before this would show Vasold talking about a gun. Officer Miller described, in the second video, speaking with another officer during this time at the gas station who told him "they found it." He testified he understood that to mean a gun had been found. Officer Miller stated he had no independent knowledge of this information.

Vasold was eventually turned over to another officer, who took him to the Davenport Police Department for an interview. Officer Miller then focused on dealing with the vehicle accident and towing Defendant's car to the Davenport Police Department for the execution of a search warrant. At no time did Officer Miller have any direct interaction with Defendant.

### C.   Testimony of Patrol Officer Chad Huetmann

Officer Chad Huetmann is a police officer with the Davenport Police Department, and has been so employed for approximately the last eight and a half years. He was working on day shift patrol February 14, 2020. At approximately 10:18 a.m., he responded to a gas station on West River Drive in Davenport, Iowa to assist with a vehicle block. He had been given information one of the subjects in the car was possibly armed with some type of firearm, and the same is reflected

---

[4] Neither section of the video was offered into evidence.

in his report. He never saw the white Chevy Malibu in operation because when he arrived Defendant's car was already blocked.

Officer Huetmann testified he briefly interacted with Defendant after Officer Miller placed Defendant in handcuffs. Officer Huetmann searched Defendant for weapons and secured him in a marked squad car. During the search, a methamphetamine pipe was found on Defendant's person. Officer Huetmann testified Defendant admitted there was some methamphetamine in the vehicle. Simultaneous to the search, he asked Defendant two questions – if he had any weapons or anything illegal on his person. Officer Huetmann testified these questions were asked out of concern for safety of both Officer Huetmann and Defendant in case he might have something that might be a danger to either of them, not as a part of a deliberate ploy to evade *Miranda* requirements. He did not issue a *Miranda* warning prior to asking these two questions.

Following this, at the request of a Davenport detective, Officer Huetmann transported Defendant in his squad car to the Davenport Police Department. Defendant remained handcuffed and was taken to a locked interview room to turn him over to Davenport detectives. Once in the interview room, as Officer Huetmann removed the handcuffs, he told Defendant "as long you cooperate, you won't have to go back in them." Initially he did not remember making this statement. However, after being shown a portion of his body camera video at the hearing, Officer Huetmann did admit to making such statements. Officer Huetmann elaborated what he meant by "cooperate" was not to be violent, throw chairs, become assaultive, destroy property, or be aggressive towards detectives while they were conducting their investigation. He acknowledged he did not explain the same to Defendant.[5]

---

[5] During a portion of questioning on these matters, Officer Huetmann was asked " [d]id you tell the defendant as long as you cooperate with the gun and drug investigation against you, you won't have to go back into these?" to which he responded "[c]orrect." From viewing the portion

Officer Huetmann had no contact whatsoever with Detective Beaudry on February 14, 2020. Further, he was not a part of the investigation into Defendant. While he knew there was possibly a gun in Defendant's car at the time of the stop, he did not know the extent of the investigation and had no further involvement with this case.

### D.      Testimony of Detective Aric Robinson

Detective Aric Robinson has been with the Davenport Police Department for a total of nineteen and a half years. He is currently with the Criminal Investigations Division. He has conducted multiple drug and gun investigations. He has been indirectly involved with methamphetamine investigations, so he knows what methamphetamine looks like. He was on duty on February 14, 2020 in his role as a detective and received a call to assist the Moline Police Department related to an ongoing investigation. The investigation involved mobile surveillance of a car traveling into Davenport over the Centennial Bridge. The plan was to conduct a vehicle takedown due to information from the drug investigation, in addition to information the subject in question possibly possessed a firearm. In his experience as an officer, this is a common approach in these types of investigations to ensure safety to stop a vehicle from fleeing. On his way to the scene, he ran Defendant's driver's license status for the state of Iowa and found Defendant was suspended multiple times for nonpayment of fines.

He was not present for the vehicle takedown but arrived immediately thereafter just as Defendant and the front seat passenger were being removed from the car. When he arrived, the car doors were open and remained open. After parking his squad car off to the side, he proceeded to Defendant's car and from the outside, Detective Robinson saw a white crystal-like substance

---

of the video shown at the hearing, observing Officer Huetmann as he testified and the context in which the statement was made, it is clear to this Magistrate Judge Officer Huetmann was referring to "cooperate" in the sense of not being assaultive, violent or disruptive.

consistent with methamphetamine in plain view on the center console, and a digital scale[6] on the driver's side floorboard where Defendant was previously seated. He was never told about Defendant admitting there was methamphetamine in the car, but he expected to see these items in relation to a methamphetamine drug investigation. These items were photographed by another detective and then taken into Detective Robinson's possession and secured as evidence. The car Defendant was driving was secured and Detective Robinson had it towed to the Davenport Police Department. Defendant was arrested for violations of Iowa state law for driving with a revoked or barred license. He was taken directly from the scene to be interviewed, which is standard in a drug and gun case like this one. While he did not conduct the interview of Defendant at the Davenport Police Department, Detective Robinson obtained the search warrant for Defendant's car.[7]

Detective Robinson testified the search warrant was obtained within one to two hours of Defendant being taken into custody. Within the search warrant, Detective Robinson included information from one of the body camera videos about furtive movements made by Defendant at the time of the vehicle block, specifically reaching underneath the seat for something. There is no information in the search warrant pertaining to the passenger in Defendant's car stating he saw a gun. Any information in the search warrant concerning the nine-millimeter Taurus black and silver handgun came from an officer involved with Defendant's interview at the Davenport Police Department.

As part of his participation in this investigation into Defendant, Detective Robinson ran Defendant's criminal history which included numerous felony convictions in Iowa and Illinois. He

---

[6] Detective Robinson explained, in the context of a drug case, a digital scale is used for weighing out different amounts of substance a person is attempting to sell.

[7] At the hearing, Detective Robinson clarified there is an incorrect name listed as the affiant on Attachment A to the search warrant. He explained he used a search warrant in the detective bureau computer system and forgot to remove the incorrect name.

is aware of two occasions when Defendant was advised of his *Miranda* rights by the Davenport Police Department. When the search warrant was executed, a firearm wrapped in a black facemask was found underneath the center console. Officers removed a plastic piece from the back of the center console and, from the back-seat area of the car, retrieved the gun.

### III.    ANALYSIS OF MOTION TO SUPPRESS

Defendant seeks to suppress the physical items found and seized during the search, the testimony of the officers concerning their observation of the physical items allegedly found during the search and detention, any testimony concerning alleged statements or admissions by Defendant following the search, and statements by Defendant made during the interrogation. Dkts. 35, 35-1, and 51.

In support, Defendant argues the officers did not have reasonable suspicion to seize the car or arrest or detain him; the officers lacked probable cause for the first search of the car; statements he may have made were products of an illegal search and seizure; as to statements made after he received *Miranda* warnings, the government cannot demonstrate the failure to provide warnings at the outset of questioning was not part of a deliberate attempt to circumvent the protections provided by *Miranda*; the government must prove Defendant voluntarily, knowingly and intelligently waived his *Miranda* rights; and the search warrant application leading to the second search of the car included evidence obtained illegally. Dkt. 35-1 pp. 3-10 and Dkt. 51 pp. 2-9.

The government resists the motion in each particular. Dkts. 39, 52. Each argument will be addressed in turn.

### A.    The Vehicle Stop and Detention of Defendant

Defendant contends the officers did not have reasonable suspicion to seize Defendant or his car. Dkt. 35-1 p. 4. He notes, while his Illinois driver's license may have been revoked, he was

not stopped in Illinois, even though there were multiple opportunities to do so. Dkt. 51 pp. 2-3. Defendant suggests it is unlikely under the circumstances presented Detective Robinson would have had enough time to check Defendant's Iowa driving status before arriving at the gas station. *Id.* p. 3. In addition, Defendant emphasizes none of the Davenport officers observed Defendant driving prior to the stop. *Id.* None of these arguments are persuasive.

The Fourth Amendment forbids "unreasonable searches and seizures." U.S. Const. amend. IV.  Its requirement that searches and seizures "be founded upon an objective justification" applies to all seizures, even those "that involve only a brief detention short of traditional arrest."  *United States v. Mendenhall*, 446 U.S. 544, 551 (1980) (citation omitted). "Stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." *United States v. Yousif*, 308 F.3d 820, 828 (8th Cir. 2002) (quoting *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)).

"A traffic stop generally must be supported by 'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring,' and 'a traffic violation—however minor— creates probable cause to stop the driver of a vehicle.'" *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (citations omitted). "If there is an 'articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered,' a traffic stop on that basis is not unreasonable under the Fourth Amendment." *United States v. Chartier*, 772 F.3d 539, 543 (8th Cir. 2014) (quoting *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)).  To qualify:

> A stop based on reasonable suspicion must be supported by specific and articulable facts. *United States v. Hughes,* 517 F.3d 1013, 1016 (8th Cir. 2008). In determining whether an officer had a "particularized and objective basis for suspecting legal wrongdoing," reviewing courts must look at the totality of the circumstances, allowing officers to draw on their experience and training. *United States v. Arvizu,* 534 U.S. 266, 273 (2002). "Factors consistent with innocent travel, when taken

together, can give rise to reasonable suspicion, even though some travelers exhibiting those factors will be innocent." *United States v. Carpenter,* 462 F.3d 981, 986 (8th Cir. 2006). Although reasonable suspicion must be more than a "hunch," the Fourth Amendment only requires an officer to articulate "some, minimal objective justification for an investigatory stop." *United States v. Fuse,* 391 F.3d 924, 929 (8th Cir. 2004).

*United States v. Coleman*, 603 F.3d 496, 499–500 (8th Cir. 2010).

Under the totality of the circumstances, this Magistrate Judge finds there was reasonable suspicion to stop the car and detain Defendant as officers had a particularized and objective basis for suspecting criminal activity. Officers observed him driving in Illinois and Iowa, both states where his license was revoked or suspended. The information the officers had was more than a hunch. Detective Beaudry knew from his investigation Defendant's Illinois driver's license was revoked. Detective Robinson ran Defendant's driver's license status for the state of Iowa while on his way to the gas station and found out Defendant was suspended multiple times for nonpayment of fines. No evidence was presented to suggest he did not have enough time to run a record check to determine Defendant's driver's license status prior to arriving at the gas station. This Magistrate Judge finds his testimony on this matter to be credible.

In addition, Detective Beaudry testified Defendant was the sole occupant of the car and was followed from Moline through Rock Island and into Davenport. When stopped at the gas station, Defendant was in the driver's seat. The totality of the circumstances demonstrates Defendant was driving the car, from Illinois into Iowa to the gas station where he was stopped, without a valid driver's license from either Illinois or Iowa. Thus, this Magistrate Judge finds officers legally stopped Defendant's car and detained Defendant.

### B.     First Search of Vehicle

Defendant contends "[t]here were no facts observed by the officers that suggested illegal activity beyond the reason for the stop" and the officers lacked probable cause for the first, warrantless search of the vehicle. Dkt. 35-1 p. 5. This argument is also unpersuasive.

The "'Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Varner,* 481 F.3d 569, 571 (8th Cir. 2007) (quoting *Horton v. California,* 496 U.S. 128, 133 n.4 (1990)). One established and well-delineated exception is the plain view doctrine. *Varner,* 481 F.3d at 572. "It is settled that an officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating character is immediately apparent, and the officer has a lawful right to access the object." *United States v. Bustos–Torres,* 396 F.3d 935, 944 (8th Cir. 2005) (citing *Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993)).

Detective Beaudry and Detective Robinson both testified they saw a baggie of a white, crystal-like substance consistent with methamphetamine and digital scale in plain view inside Defendant's car. They both saw these items from outside of Defendant's car.[8] Detective Beaudry has been an officer for almost seven years and has been with the criminal investigation division

---

[8] While Detective Beaudry testified he remembered the doors of Defendant's car being closed, Detective Robinson remembered the doors being open. Regardless, this does not impact the credibility of either officers' testimony or the lawfulness of their viewing of the items in Defendant's car. The officers were lawfully positioned to see the items referenced. In addition, it is reasonable to conclude, as Detective Beaudry was part of the vehicle block, he would have had an opportunity to see in plain view the car with the doors closed; Detective Robinson arrived later, when the occupants were being removed from the vehicle, and the doors would have been open.

for three years. He testified at the hearing he believed, from his training and experience, the baggie he saw contained methamphetamine. Although he could not remember at the hearing if the baggie was on the front passenger seat or around the center console, in either location it would have been within plain view of the officers. Detective Robinson has been an officer for nineteen and a half years. He has conducted multiple drug and gun investigations, while being indirectly involved with methamphetamine investigations; thus, he knows what methamphetamine looks like. Detective Robinson testified at the hearing he could see a white crystal-like substance consistent with methamphetamine in plain view on the center console, and a digital scale on the driver's side floorboard where Defendant was previously seated.

Defendant contends "the claim of law enforcement that a baggie of methamphetamine was seen in plain view is contradicted by the fact that [Defendant] was asked if he was in possession of anything illegal." Dkt. 35-1 p. 4. However, this does not change the analysis. The officer who asked Defendant this question was Officer Huetmann, not Detectives Beaudry or Robinson. Officer Huetmann asked this question as part of a pat-down of Defendant for purposes of safety. There is nothing to suggest Officer Huetmann knew what either of the detectives had viewed in plain sight. His question is logical given the context of a pat-down of Defendant.

Based on the evidence presented, both detectives testified credibly as to what they saw in the car, they were in lawful position to view the items (outside of the car) and the incriminating character of the items was immediately apparent based upon their training and experience. Thus, this Magistrate Judge finds the plain view exception applies to the seizure of the methamphetamine and scale from Defendant's car.

C.      **Defendant's Statement – Illegal Stop and Seizure**

Defendant argues there were no intervening circumstances which occurred between the illegal stop and seizure and his subsequent statements.  Dkts. 35-1 p. 8 and 51 pp. 5-6. Defendant argues his case is like *Brown v. Illinois*, 422 U.S. 590 (1975), and like the defendant's statements in *Brown*, his statements here should be suppressed as fruits of the illegal police conduct. Dkts. 35-1 pp. 7-8 and 51 pp. 5-6. He contends "[t]he giving of a *Miranda* warning does not by itself break the causal chain between an illegal search and arrest and a defendant's subsequent statements." *Id.*

Defendant made statements to officers both at the scene and later in an interview at the Davenport Police Department. The government states in its briefing, and confirmed on the record at the hearing, it will not use in its case in chief Defendant's admission at the scene the methamphetamine in the car was his. On this basis, this Magistrate Judge recommends granting Defendant's motion, suppressing this statement, providing the government may not use it in its case in chief.

As it relates to statements Defendant made after he was taken from the scene, this Magistrate Judge determines those statements are not subject to suppression based on Defendant's contention those followed an illegal stop and seizure. In the first instance, Defendant's case does not start from the same factual base as *Brown*. In *Brown*, the defendant was arrested *without* probable cause and without a warrant, and after given his *Miranda* warnings while in custody, he made two inculpatory statements. *Brown,* 422 U.S. at 591. Here, as analyzed above, the initial stop of the car Defendant was driving was supported by probable cause. In addition, the investigation properly continued as incriminating evidence was found in plain view by multiple officers.

If a statement is made following a warrantless arrest based on probable cause, the statement is not subject to suppression as derivative of an improper arrest. *United States v. Oropesa*, 316 F.3d 762, 768-69 (8th Cir. 2003). Because the stop and seizure here were legal, the statements by Defendant are not subject to suppression on that basis.

### D. Defendant's Statements - *Miranda*

As to the statements made at his interview at the Davenport Police Department, Defendant contends the government must show the failure to provide *Miranda* warnings to him at the scene at the outset of questioning was not part of a deliberate attempt to circumvent *Miranda* with his later interview. In addition, Defendant maintains the government must show Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights as to his post *Miranda* warning statements.

#### 1. Deliberate attempt to circumvent *Miranda*

In *Oregon v. Elstad*, 470 U.S. 300 (1985), the Supreme Court decided whether an initial failure of law enforcement officers to administer the warnings required by *Miranda* without more, "taints" subsequent admissions made after a suspect has been fully advised of and has waived his *Miranda* rights. *Id.* at 300. The court held a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings. *Id.* at 318. The subsequent *Miranda* warnings will ordinarily "suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314. The later statement is admissible so long as it was made voluntarily, and its voluntariness was not undercut by the suspect's ignorance that his initial statement could not be used against him. *Id.* at 316–17.

In response to this, some law enforcement officers began to conduct "question first" interrogations, deliberately omitting *Miranda* warnings. *United States v. Ollie*, 442 F.3d 1135, 1141 (8th Cir. 2006). Once a confession was received, officers would give a *Miranda* warning and the suspect would generally confess again. *Id.* If the subsequent confession was challenged courts, relying on *Elstad*, would often uphold their admissibility. *Id.* (citing *Missouri v. Seibert*, 542 U.S. 600, 609 – 11 (2004)).

In *Seibert*, the Supreme Court revisited the issue whether a "midstream" *Miranda* warning could adequately advise a suspect of his or her rights. A plurality of four justices suggested courts consider five criteria in making that determination. *Seibert*, 542 U.S. at 615. Applying these criteria, the plurality concluded the *Miranda* warnings had not sufficiently apprised the suspect of her rights. *Id.* at 616-17.

Justice Kennedy concurred in the judgment, providing the fifth vote to suppress the statements. However, his opinion provided for courts in these circumstances to continue to be governed by *Elstad*, suppressing post-warning statements only where law enforcement *intentionally* used the two-step interrogation technique to render *Miranda* warnings ineffective. *Id.* at 621-22 (Kennedy, J., concurring in judgment).  The Eighth Circuit has determined that, "[b]ecause Justice Kennedy provided the fifth vote and his concurrence resolved the case on narrower grounds than did the plurality, it is his reasoning that rules the present case." *Ollie*, 442 F.3d at 1142. In addition, as to the burden of proof on the issue of intent, the Eighth Circuit held "when a defendant moves to suppress a post-warning statement that he contends was given as part of a question-first interrogation, the prosecution must prove, by a preponderance of the evidence, that the officer's failure to provide warnings at the outset of questioning was not part of a deliberate attempt to circumvent *Miranda*." *Id.* at 1142-43.

In this case, this Magistrate Judge finds the government has met its burden to demonstrate the questioning here was not part of a deliberate attempt to circumvent *Miranda*. The facts demonstrate clearly, two different officers from two different police departments questioned Defendant in two distinct locations – Officer Huetmann of the Davenport Police Department at the gas station and Detective Beaudry of the Moline Police Department at the Davenport Police Department. Neither officer spoke to the other to exchange information. Moreover, Officer Huetmann knew very little about the investigation of Defendant.

Officer Huetmann testified he searched Defendant at the scene for weapons and secured him in a marked squad car. During the search, he asked Defendant two questions – if he had any weapons or anything illegal on his person. Officer Huetmann explained these questions were asked out of concern for safety of both Officer Huetmann and Defendant in case he might have something that might be a danger to either of them. He testified these questions were not part of a deliberate ploy to evade *Miranda* requirements. Further, Officer Huetmann had no interactions whatsoever with Detective Beaudry on the date in question. Detective Beaudry testified he was not involved in detaining or transporting Defendant to the police department, he does not know Officer Huetmann and he had no knowledge of Officer Huetmann's interaction with Defendant. For these reasons, because the government has shown there was no deliberate attempt to evade *Miranda*, Defendant was not subjected to the two-step interrogation technique at issue in *Seibert* and this case is governed by *Elstad*.

But, even applying the criteria the *Seibert* plurality suggested leads to the same conclusion. To determine whether the midstream warnings could be effective in advising the suspect of his or her rights, the *Seibert* plurality suggested courts consider five criteria: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two

statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert,* 542 U.S. at 615.

Here, the two questions asked at the gas station were general questions without detail, directed to safety concerns. The questions at the police department interview were presumably more detailed but posed for a different purpose – investigation. The questions at the scene and the interview at the Davenport Police Department occurred approximately within one hour of each other. Different officers conducted the questioning at the different locations with no coordination between them. Even though the questions discussed at the two locations arguably dealt with the same general topics, there was no evidence the two questions at the gas station flowed into the interview at the Davenport Police Department. Indeed, the fact that Detective Beaudry had no knowledge whatsoever of Officer Huetmann's interactions with Defendant demonstrate Detective Beaudry could, in no manner, treat the second round of questions as continuous with the first.[9]

For these reasons, this Magistrate Judge finds there was no deliberate attempt to evade *Miranda* in this case.

### 2.     Voluntariness

It is well-settled that "'*Miranda* warnings are required when a suspect is interrogated while in custody.'" *United States v. Valquier*, 936 F.3d 781, 784 (8th Cir. 2019) (quoting *United States*

---

[9] Defendant contends whether Officer Huetmann advised Detective Beaudry Defendant had made statements is irrelevant because of the collective knowledge doctrine. Dkt. 51 p. 9. However, Defendant provides no case law in support of the proposition the collective knowledge doctrine applies in an *Elstad* or *Seibert* analysis as to a deliberate attempt to evade *Miranda.* Rather, the collective knowledge doctrine imputes the knowledge of all officers involved in an investigation upon the seizing officer in order to uphold "an otherwise invalid search or seizure." *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008).

*v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011)).[10] A suspect may waive his *Miranda* rights, provided the waiver is made voluntarily, knowingly, and intelligently. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether a waiver is voluntary, knowing, and intelligent depends on the totality of the circumstances. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986). Courts consider the particular facts and circumstances of the case, including the background, experience, and conduct of the suspect. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). The government must prove by a preponderance of the evidence that the suspect waived his *Miranda* rights. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Statements must be voluntary to be admissible. *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). Statements to law enforcement are voluntary, for *Miranda* purposes, if they are the result of an "essentially free and unconstrained choice by [their] maker." *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). "'A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.'" *United States v. Mshihiri*, 816 F.3d 997, 1004 (8th Cir. 2016) (quoting *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (en banc)).

The test for voluntariness is whether, considering the totality of circumstances, the suspect's will is overborne. *United States v. Meirovitz,* 918 F.2d 1376, 1379 (8th Cir. 1990). Courts consider the following characteristics of the person making the statement when analyzing

---

[10] In this case, at the hearing, the government confirmed Defendant was in custody and interrogated during the interview at the police department.

voluntariness: (1) age; (2) general intelligence and education; (3) whether the person was intoxicated or under the influence; (4) whether the statements were made after being informed of their *Miranda* rights; and (5) whether the person was aware of the protections afforded to suspected criminals by the legal system. *United States v. Chaidez,* 906 F.2d 377, 380–81 (8th Cir. 1991) (citations omitted).

In this case, a review of Defendant's characteristics and the circumstances surrounding his statements in the interview suggest those statements were voluntary. Prior to beginning the interview, Detective Beaudry testified he read Defendant his *Miranda* rights from a Moline Police Department form. Defendant did not have any questions regarding his rights, nor did he indicate he did not understand the *Miranda* form. Detective Beaudry testified he told Defendant the *Miranda* rights form was just an acknowledgment he understood his rights, nothing else. After signing and initialing the *Miranda* form, Detective Beaudry testified Defendant indicated he was willing to talk and the interview proceeded.

No evidence was presented Defendant's age or general intelligence and education affected his ability to understand his rights, nor that he was intoxicated or under the influence. Detective Beaudry testified it did not appear to him Defendant had any mental issue or did not understand what was going on in the interview. In fact, he described him as articulate. From the testimony of Detective Robinson, we know Defendant's criminal history includes numerous felony convictions in Iowa and Illinois. Detective Robinson reviewed two other occasions when Defendant was advised of his *Miranda* rights with the Davenport Police Department. Defendant's criminal history and previous two *Miranda* warnings suggest he was aware of the protections afforded to him by the legal system.

Defendant argues Officer Huetmann's statement when removing his handcuffs that as long as he cooperates, he will not have to go back into handcuffs, constitutes a promise of leniency, thus constituting a separate basis for finding the statement inadmissible. Dkt. 51 p. 9. Although a promise made by law enforcement is a relevant consideration in assessing police conduct, it is only one circumstance to be considered and does not render a confession involuntary per se. *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001). "A promise is merely one factor in the totality of the circumstances." *LeBrun*, 363 F.3d at 725 (citing *Simmons*, 235 F.3d at 1133).

This Magistrate Judge finds the statement by Officer Huetmann regarding the handcuffs remaining off if Defendant cooperates does not change the finding as to the voluntariness of Defendant's statements. The context in which this statement was made makes it clear it was neither an implied nor express promise of leniency. This statement was made as Officer Huetmann removed the handcuffs from Defendant as he was placed in the interview room. It is clear to this Magistrate Judge this statement was meant to convey that the handcuffs would not need to be placed back on Defendant if he did not act out. Indeed, Officer Huetmann credibly testified what he meant by "cooperate" was not to be violent, throw chairs, become assaultive, destroy property, or be aggressive towards detectives.

This Magistrate Judge finds, under the totality of the circumstances and by a preponderance of evidence, the government has shown Defendant's waiver of his *Miranda* rights was voluntary, knowing, and intelligent.

### E.      Search Warrant – Probable Cause

Defendant argues the decision to seek a search warrant for the car is inextricably impacted by the tainted evidence. Dkt. 35-1 at p. 7. He contends the search warrant application included a

presentation of the evidence discovered as a direct result of the Fourth Amendment violation cited by Defendant. *Id*. This argument is unavailing.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Ordinarily, evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Houck*, 888 F.3d 957, 959 (8th Cir. 2018); *United States v. Cannon*, 703 F.3d 407, 412 (8th Cir. 2013) (internal quotation marks omitted). The exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure ... but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *Segura v. United States,* 468 U.S. 796, 804 (1984).

Where a detention and arrest did not violate the Fourth Amendment, a search warrant obtained after and based on the detention and arrest is not fruit of a poisonous tree. *United States v. Benson*, 686 F.3d 498, 502 (8th Cir. 2012). The so-called "automobile exception" permits law enforcement to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime. *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003).

The affidavit executed by Detective Robinson as part of the search warrant application contains information demonstrating probable cause exists to search the car both for an unauthorized person (felon) in possession of a firearm and possession of controlled substances. The sources for this information include observations of law enforcement of the suspected methamphetamine and digital scale in plain view (paragraph 3 of the affidavit); officer observations of Defendant at the scene (paragraph 3 of the affidavit); statements made by

Defendant in his interview with Detective Beaudry (paragraph 5 of the affidavit) and the statement Defendant made to Officer Huetmann (paragraph 4 of the affidavit).[11]

Except for the statement to Officer Huetmann, this Magistrate Judge has determined, as set forth above, the balance of the information in the search warrant affidavit was legally obtained. And, even without Defendant's admission about the methamphetamine (paragraph 4 of the affidavit), there is still probable cause to support the search warrant. Further, even without Defendant's statements from the interview (paragraph 5 of the affidavit), there is still probable cause to support the search warrant. Also, as noted by the government, based on the information about Defendant from the investigation prior to the stop along with the officers' plain view observations, probable cause existed to search Defendant's car even without a search warrant.

And for the sake of completion, even if the search warrant was invalidated, the *Leon* good-faith exception to the exclusionary rule applies, as established in *United States v. Leon*, 468 U.S. 897 (1984). Under the good-faith exception, the court will not suppress evidence seized pursuant to a search warrant issued by a magistrate judge that is later determined to be invalid, if the executing officer's reliance upon the warrant was objectively reasonable. *Id*. at 922. The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (quoting *Leon*, 468 U.S. at 922, n.23).

*Leon* identified four situations in which an officer's reliance on a warrant would be unreasonable: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus

---

[11] The paragraph numbers in the affidavit are not in order.

misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable "; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid. *Leon*, 468 U.S. at 923.

None of these four situations are present in this case. No evidence has been presented of false statements made knowingly, or with reckless disregard for the truth. Nor is there an assertion or evidence the reviewing judge abandoned her judicial role, or the warrant is so lacking in probable cause to render reliance on it unreasonable. Finally, the warrant is not so deficient on its face that no officer could question its validity. There is no information presented by Defendant or the government showing any officer had knowledge, either firsthand or otherwise, the search was unconstitutional.

Accordingly, this Magistrate Judge finds the search warrant contained sufficient, untainted information within the four corners of the document to support the probable cause finding of the issuing judge and, regardless, the *Leon* good faith exception would apply to this search warrant.

## IV. RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED, Defendant's Motion to Suppress Evidence and Statement and Request for Evidentiary Hearing (Dkt. 35) be granted in part and denied in part, as follows:

a. the Motion be granted as to use, in the government's case in chief, of the Defendant's response to Officer Huetmann's questions to him at the scene; but

b. the Motion be denied as to the balance of the evidence Defendant seeks to suppress.

IT IS ORDERED, the parties have until June 15, 2021 to file written objections to the Report and Recommendation, pursuant to pursuant to 20 U.S.C. § 636(b)(1), Fed. R. Crim. P. 59(b)(2), and L.Cr.R. 59.[12]

**IT IS SO ORDERED.**

**DATED** this 8th day of June, 2021.

_____
STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[12] Prior to the presentation of evidence at the hearing, the parties agreed on the record to shorten the objection deadline to seven days. Dkt. 50.